UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:19-CR-91 |
| | § | |
| FRANCISCO GONZALEZ JR. | § | |

## ORDER ON MOTION TO SUPPRESS

In early 2019, a firearm and other items were taken from a truck parked at a local restaurant. While investigating this crime, officers of the Corpus Christi Police Department detained Defendant Francisco Gonzalez, Jr. During his detention, the officers removed the key to a Chevrolet Avalanche and $700 in one hundred-dollar bills from his shirt pocket. Gonzalez was later indicted for unlawfully possessing the firearm that was taken from the truck. D.E. 10.

He now moves to suppress evidence obtained as a result of his detention and search. D.E. 40. The Government opposes the motion. D.E. 43. The parties presented evidence at a hearing on December 3, 2019. The Court heard testimony from Officers Andrew Esquibel, David Guillen, and Thomas Zirkle, as well as crime scene investigator, John Prebul. It also admitted two exhibits into evidence: a map of the area where the detention occurred and video of the detention from Officer Guillen's body camera.[1]

---

[1] The Defendant also attached various exhibits to his motion, but they were not entered into evidence. He also asks the Court to take judicial notice of his February 3, 2019 indictment in this case. The Court takes notice of the indictment which is actually dated February 13, 2019. D.E. 10.

For the following reasons, the Court GRANTS IN PART and DENIES IN PART the Defendant's motion. D.E. 40. Only the key and cash taken from the Defendant's pocket will be suppressed.

## FINDINGS OF FACT

**A.     An iPad and other items are taken from the Martinez family's truck.**

On January 18, 2019, the Martinez family was eating dinner at a Joe's Crab Shack restaurant. While leaving the restaurant, they noticed their truck's rear passenger window was broken and that items were missing, including several bags and their contents. The family called the Corpus Christi Police Department (CCPD), and Officer Andrew Esquibel responded about 8:23 p.m.

The family informed Esquibel that the stolen items included, among other things, $500 in one hundred-dollar bills, a handgun, and an iPad, which was still sending electronic location information to a cellphone through the Find My iPhone application. Officer Esquibel had previously used this application. In his experience, it sends real-time location information for individual mobile devices and is very precise, though it occasionally has glitches. Using the iPad's location information, Officer Esquibel directed other CCPD officers to a Chili's and then an Olive Garden restaurant to find the culprit.

**B.     Officer Esquibel informs Officer Guillen of a possible suspect and the iPad's location.**

At some point, Officer Esquibel informed the responding officers of a possible suspect, Jose Corpus, a Hispanic man with a slim build. Esquibel believed Corpus had

committed other car burglaries around the same time period, which Esquibel described as "smash and grabs." One of the responding officers, David Guillen, had seen pictures of Corpus and was also familiar with his appearance. In addition to identifying Corpus as a suspect, Officer Esquibel told Guillen the iPad had tracked in the front of the Olive Garden and then in the northeast corner of its parking lot.

    C.    **The officers detain the Defendant.**

Officer Guillen arrived at the restaurant near the northeast corner of its parking lot. Once there, he observed the Defendant leaving the driver's side of a black Chrevolet Avalanche in the same corner of the parking lot. The Defendant then walked towards the restaurant's entrance. As he was walking, he looked at Guillen's marked patrol car and then increased his pace. Guillen noticed the Defendant looked like Jose Corpus. Both were Hispanic men with slim builds. During this time, Officer Thomas Zirkle also arrived at the scene.

Officers Guillen and Zirkle then followed the Defendant into the restaurant, and found him walking from the back of the restaurant to the front. They asked to speak with him outside, and the Defendant complied. They took the Defendant to a patrol vehicle operated by Officers Calderon and Garcia. They had the Defendant place his hands on the vehicle while Officer Guillen patted him for weapons. Guillen did not find any weapons or remove any items from the Defendant's pockets during this first frisk.

The officers then inquired into the Defendant's identity and activity that night. The Defendant initially identified himself as "Frank Gonzalez" rather than "Francisco Gonzalez." He also told the officers that he had walked to the restaurant from a nearby

shopping mall so he could get dinner. When asked about his location at the back of the restaurant, Gonzalez claimed he was trying to find the restroom, which was actually located at the front of the restaurant. Gonzalez explained he was asking a waitress where the restrooms were located. During this questioning, Officer Guillen noticed the Defendant was sweating and asked him why he was doing so. The Defendant did not reply.

At the same time, Officer Zirkle was also investigating a Cadillac Escalade that was parked at the front of the restaurant, which he suspected could have been connected to the burglary of the Martinez family's truck.

### D. The officers find a car key and cash on the Defendant, and then arrest him.

The officers were unable to definitively identify Gonzalez, but suspected his first name may have actually been "Francisco." After some questioning from Officer Garcia, he said he "guessed" his legal name might be Francisco. He also provided a social security number and date of birth, and informed the officers he had been arrested a year and a half earlier. Officer Garcia believed Gonzalez was lying about his identity. For this reason, she had the Defendant handcuffed.

Officer Guillen then frisked him for a second time, this time removing a car key and cash from his shirt pocket. The key consisted of both a traditional metal car key and a remote key fob. Officer Guillen did not view the key as a weapon, but Officer Zirkle testified the Defendant could have used the key to stab an officer in the neck.

Gonzalez was then put in a patrol car. While Gonzalez was in the car, Officer Guillen said he believed Gonzalez was lying to the officers, in part because of his sweating. Officer Zirkle counted the cash from Gonzalez's pocket, which totaled $700 in one hundred-dollar bills. He noted to Officer Guillen that it partially matched the amount taken from the Martinez family—$500 in one hundred-dollar bills.

Guillen and Zirkle then walked to the Avalanche that Guillen had seen Gonzalez leaving, while Calderon and Garcia drove Gonzalez to the Avalanche. The vehicle was parked between a white truck and a dark colored van. It appeared to be the only Avalanche in the immediate area, though the parking lot was nearly full. One of the officers then used the key taken from Gonzalez's pocket to remotely start the vehicle without entering it.

Then, without opening any doors or windows, the officers shined their flashlights into the Avalanche's windows and saw some of the Martinez family's items, including a purse. The officers then arrested Gonzalez. In all, the pre-arrest detention lasted little more than ten minutes.

## DISCUSSION

Defendant challenges both his initial detention and the removal of the key and cash from his pocket.[2] He claims the officers lacked reasonable suspicion justifying his initial detention, they detained him for too long, and they had no reason to frisk him a second time or remove items from his pocket. For these reasons, he asks the Court to

---

[2] Defendant does not argue his detention ever constituted a *de facto* arrest requiring probable cause. *See United States v. Massi*, 761 F.3d 512, 522 (5th Cir. 2014). Nor does the Government argue the items were taken pursuant to a search incident to arrest.

suppress his detention and search, as well as any resulting evidence. He also raised discovery issues, but these were resolved at the evidentiary hearing.

### A. Reasonable Suspicion to Detain

"[P]olice officers may briefly detain a person for investigative purposes if they can point to specific and articulable facts that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (citations and quotations omitted). The detaining officer must "articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotations omitted).

In determining reasonable suspicion, a court must look to the "totality of the circumstances and the collective knowledge and experience of the officer or officers." *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006). "The government bears the burden of showing the reasonableness of a warrantless search or seizure." *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (citing *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995)).

The Government argues the officers had a reasonable suspicion to believe the Defendant was engaged in criminal activity because (1) the iPad provided reliable location information, (2) the iPad's location data showed it was in the northeast corner of the parking lot, (3) Officer Guillen saw the Defendant leaving the Chevrolet Avalanche in that area, (4) the Defendant walked faster after seeing Officer Guillen's marked patrol

vehicle, and (5) Officer Guillen believed the Defendant resembled another suspect, Jose Corpus.

The Court agrees with the Government. Officer Guillen, who initiated the detention, reasonably believed the Defendant was actually Jose Corpus because they were both Hispanic men with slim builds. The Defendant counters that, at the outset, Officer Esquibel lacked a reasonable suspicion to identify Corpus as a suspect. But Esquibel suspected Corpus of burglarizing other vehicles around the same time and he described Corpus's preferred crimes as "smash and grabs," which occurred in this case.

For his part, Officer Guillen properly relied on Esquibel's identification of Corpus. Reasonable suspicion does not require an officer's personal observation, but can also "arise from the 'collective knowledge' of law enforcement entities, so long as that knowledge gives rise to reasonable suspicion and was communicated between those entities at the time of the stop." *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014).

Moreover, Officer Guillen was not solely relying on Officer Esquibel's identification of Corpus. To the contrary, he had additional reasons to suspect Corpus had burglarized the Martinez family truck. Guillen saw the Defendant—who looked like Corpus—leaving the Avalanche that was parked in the northeast corner of the parking lot, the same area where the iPad was located on the Find My iPhone application.[3] And he

---

[3] Defendant attached a narrative report by Officer Esquibel to his motion, which suggests the iPad was not located in the northeast corner of the parking lot until after the Defendant was already detained. The Court finds this was not the case. Officer Zirkle testified that Officer Esquibel informed the responding officers that the iPad was in the northeast corner before he and Guillen went into the restaurant. And Officer Guillen's body camera footage shows

saw the Defendant increase his pace after seeing Guillen's marked police vehicle. *See United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("It was also reasonable for Deputy Uhan to interpret the vehicle's sudden acceleration as evidence of unprovoked flight.").

The Defendant challenges the relevance of the iPad's location, noting that Officer Zirkle was also investigating a Cadillac Escalade parked at the front of the restaurant near the iPad's previous location. But reasonable suspicion is not defeated merely because officers have multiple suspects. To the contrary, they "need not rule out the possibility of innocent conduct" to justify a detention. *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

All together, the Defendant's resemblance to Jose Corpus, location in the same corner of the parking lot as the iPad, and evasive response to Officer Guillen's marked patrol vehicle gave rise to a reasonable suspicion that he had burglarized the Martinez family's truck. The officers were therefore justified in detaining him.

### B. Time of Detention

"Even if articulable suspicion supports an investigatory stop and patdown, the Fourth Amendment demands that the scope and duration of the detention be reasonable." *United States v. Bailey*, 743 F.3d 322, 336 (2d Cir. 2014). In assessing the scope and duration of detention, "courts properly examine whether the police diligently pursued a

---

him driving his vehicle to that corner, suggesting he had already been informed of the iPad's location. In any case, the Defendant did not enter the report into evidence at the evidentiary hearing.

means of investigation that was likely to confirm or dispel their suspicions quickly." *Id*. (citations and quotations omitted).

Here, the parties dispute the scope of detention based on the Defendant's identification as "Frank," rather than "Francisco." The Government says this was a deliberate misidentification, constituting a crime and justifying further detention. It also says this extended the time needed to determine if the Defendant was actually Jose Corpus. For his part, the Defendant argues there was no misidentification because he provided other correct information, including his date of birth and social security number. And, in any case, the officers took too long to verify his identity.

The Court agrees with the Government that, at the very least, the Defendant's identification as "Frank" delayed the officers in verifying his identity and justified an extension of his detention. Video from Officer Guillen's body camera shows Officers Calderon and Garcia attempting to verify the Defendant's identity, even asking whether "Francisco" was the correct name. While the Defendant eventually indicated his name was Francisco, his actions delayed the officers.

And, even if the officers had verified the Defendant's identity, they had a continued reasonable suspicion that he burglarized the Martinez family's truck. Officer Guillen had other reasons to suspect the Defendant had committed this crime—the iPad location information and the Defendant's evasive behavior before he entered the restaurant. Once detained, the Defendant furthered the officers' suspicion by sweating excessively. Officer Guillen even believed the Defendant was lying, based in part on his

sweating. Combined, these facts supported a reasonable suspicion of prior criminal activity independent of the Defendant's identity.

Because the officers had a reasonable suspicion that the Defendant stole the Martinez family's property, they could detain him while they took a few minutes to look into the Avalanche's unopened windows for that property. *See Bailey*, 743 F.3d at 338 ("[A] defendant reasonably suspected of criminal activity at particular premises may be detained briefly pursuant to *Terry* while police lawfully search the premises to confirm or dispel that suspicion.").

### C. The Second Frisk

Finally, the Defendant challenges Officer Guillen's removal of the key to the Avalanche and $700 from his shirt pocket, characterizing it as an illegal search. He argues the officers had no reason to frisk him a second time and no reason to remove the items, which were not weapons. The Court agrees on these points, but the Defendant has not identified any evidence that is the fruit of this illegal search. Nor can the Court find any. The Court will therefore only suppress the cash and key taken from the Defendant's pocket during his second frisk.

#### 1. Reasonable Suspicion to Conduct a Second Frisk

A second frisk is not per se unreasonable. *United States v. Osbourne*, 326 F.3d 274, 278 (1st Cir. 2003). "In the end, the reasonableness of a second or subsequent pat-frisk conducted pursuant to *Terry* is to be determined under a standard that takes account of the fact that context is vital." *Id*. (citations and quotations omitted). Courts have

upheld the constitutionality of multiple frisks in a number of cases.  *See, e.g.*, *id*; *United States v. Rasberry*, 882 F.3d 241, 249 (1st Cir. 2018).

However, these cases generally present scenarios in which officers have reason to believe the detainee was armed even after an initial frisk, or that the initial frisk was ineffective.  In *Osbourne*, for example, the initial frisk was "quick," the officer had been informed the detainee was "always armed with a semi-automatic weapon," and the frisks took place in a "rapidly evolving situation" involving two suspects.  *Id*. (quotations omitted); *see also Rasberry*, 882 F.3d at 249 (second frisk justified where first frisk was restricted to the detainee's lower back).

Here, the first frisk did not reveal any weapons.  And there was only one suspect who was already in handcuffs when the second frisk occurred.  While Officer Zirkle testified the Defendant could have used the key to stab an officer, Officer Guillen—who actually took the key—did not view it as a weapon.  More importantly, there is no evidence that Officer Zirkle ever told Guillen that a key could be used as a weapon.  Nor is there any indication that, after the first frisk, Officer Guillen had reason to believe the Defendant possessed a key or any other potential weapon.  *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) ("[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?") (citations and quotations omitted).

For these reasons, the key and cash removed from the Defendant's pocket during the second frisk must be suppressed. But this does not resolve what evidence, if any, is the fruit of this illegal search.

### 2. Fruit of the Poisonous Tree

"It is firmly established that, once the defendant goes forward with specific evidence demonstrating taint, the government has the final burden of persuasion to show that the evidence is untainted." *United States v. Cherry*, 759 F.2d 1196, 1207 (5th Cir. 1985). "If the defendant meets this initial burden, the evidence will be suppressed unless the government proves that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *United States v. Kornegay*, 410 F.3d 89, 94 n.3 (1st Cir. 2005).

The Defendant suggests his second frisk led the Government to discover evidence beyond the key and cash, but he does not specifically identify that evidence. In the Court's view, his only potential argument is that the officers used the key to locate the Avalanche, leading to the discovery of the Martinez family's property in the vehicle. But the evidence does not support this conclusion.

Officer Guillen knew the Avalanche's location and associated it with the Defendant before he retrieved the key, as he had already seen the Defendant leaving from the driver's side of the vehicle. His body camera footage demonstrates this point. It shows him walking to the Avalanche without the aid of the key, only starting the car once he was directly in front of it. There is no question he was approaching the correct

vehicle, as there were no other black Avalanches in the immediate vicinity. Moreover, the key did not prolong the Defendant's detention. The officers already intended to investigate the Avalanche, and were only delayed by the Defendant's identification as "Frank."

For these reasons, the Defendant has failed to make an initial showing that his second frisk led to the discovery of evidence beyond the key and cash taken from his pocket. Only these items will be suppressed.

## CONCLUSION

For the stated reasons, the Defendant's motion is GRANTED IN PART and DENIED IN PART. D.E. 40. Only the key and cash taken from the Defendant's pocket during his second frisk will be suppressed.

ORDERED this 21st day of January, 2020.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE